UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| THE JAMES MADISON PROJECT, ) <br> and BRIAN J. KAREM ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> U.S. DEPARTMENT OF DEFENSE, ) <br> ) <br> Defendants. ) | Civil Action No. 22-153 (PWG) |

## DECLARATION OF LINDA M. KIYOSAKI

I, LINDA M. KIYOSAKI, hereby declare and state:

1. I am the Chief of Enterprise Guidance Services ("EGS") at the National Security Agency ("NSA" or "Agency"). I have been in this position since December 2019, and I have been employed with NSA since 1985. I am responsible for oversight of NSA's Freedom of Information Act Office ("NSA FOIA Office"). This office has primary responsibility for responding to requests for NSA records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974 ("PA"), 5 U.S.C. § 552a. I have held a range of significant leadership positions throughout the Agency, and I have a detailed understanding of NSA's operations, management processes, and resources. Immediately prior to assuming my current position, I was the Deputy Chief of EGS. My other experience includes serving as the Senior Intelligence Analysis Authority; the Associate Director for Strategy, Programs and Performance for the Mission Management Investment Portfolio; an NSA representative to the Central Intelligence Agency's (CIA) Counterterrorism Center; an NSA representative to the Federal

Bureau of Investigation (FBI); and the Enterprise Engagement and Mission Management Associate Director.

2. I am also a TOP SECRET original classification authority ("OCA") pursuant to Section 1.3 of Executive Order ("E.O.") 13526, dated 29 December 2009 (75 Fed. Reg. 707). It is my responsibility to assert the applicable FOIA exemptions for NSA information in the course of litigation.

3. Through receiving information in my official capacity and in the exercise of my official duties, I have become familiar with the current litigation, which arose out of a FOIA request filed by The James Madison Project and Brian J. Karem (hereinafter "Plaintiffs").

4. The purpose of this declaration is to justify the withholding in full of the intelligence information requested by Plaintiffs under Exemptions 1 and 3 of the FOIA, 5 U.S.C. §§ 552(b)(1) and (3). NSA cannot release the intelligence information requested by Plaintiffs because it is properly exempt from disclosure under the FOIA based upon Exemptions 1 and 3, respectively. This is because such a release would reveal information that is currently and properly classified in accordance with E.O. 13526 and protected from release by statutes, specifically Section 6 of the National Security Agency Act of 1959 (Pub. L. No. 86-36, codified at 50 U.S.C. § 3605), 18 U.S.C. § 798, and Section 102(A)(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024). In this declaration, I also provide background on the role of signals intelligence ("SIGINT") in safeguarding national security, the authority to classify national intelligence information, and NSA's processing of Plaintiffs' FOIA request.

## NSA's ORIGIN AND MISSIONS

5. NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense ("DoD") under the direction, authority, and control of the Secretary of Defense. NSA has two primary missions: (1) to collect, process, analyze, produce, and disseminate SIGINT information for foreign intelligence and counterintelligence purposes to provide support for national and departmental requirements and for conducting military operations; and (2) to conduct information assurance/cybersecurity activities. SIGINT involves collecting foreign intelligence from communications and information systems, including foreign communications, radar and other electronic systems.

6. NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign signals. In performing its SIGINT mission, NSA exploits foreign signals to obtain intelligence information necessary to the national defense, national security, and/or the conduct of foreign affairs. The technological infrastructure that supports NSA's SIGINT collection network has taken years to develop at a cost of billions of dollars and significant human effort. It relies on sophisticated collection and processing technologies designed to keep pace with challenging new technological developments.

## IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

7. There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary for the national security of the United States. SIGINT information provided by NSA is routinely distributed to a wide variety of senior Government officials, including the President, the President's National Security Advisor, the Director of National Intelligence, the Secretaries of Defense, State, Treasury, and Commerce, U.S. ambassadors

serving in posts abroad, the Joint Chiefs of Staff, and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments including, among others, the CIA, FBI, the Departments of the Army, Navy, and Air Force, and various intelligence components of DoD. Information provided by NSA in a classified setting to the military and other government agencies and officials within the Intelligence Community ("IC") is relevant to a wide range of important issues including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This sensitive information is often critical to the conduct of U.S. foreign policy and of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

8. NSA's ability to produce SIGINT depends on its access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

9. The subset of SIGINT information obtained from intercepted foreign communications is called communications intelligence ("COMINT"). A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because the ability to exploit foreign communications is fragile. Disclosure of the identity of the targets, the ability to exploit those targets, or the vulnerability of particular foreign communications would encourage countermeasures by the targets of NSA's COMINT efforts. Disclosure of even a single intercepted communication holds the potential to

reveal the intelligence collection techniques that are applied against targets around the world. Once alerted, COMINT targets may change the way they communicate, which could inhibit access to the targets' communications and, therefore, deny the United States access to information crucial to the defense of the United States both at home and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of that target's signals. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the IC must operate without the information the communications provided. Such losses are extremely harmful to the national security of the United States.

10.   Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed statutes to protect NSA's SIGINT efforts from damage by disclosure. These statutes recognize the vulnerability of SIGINT to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. These statutes are: Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605); Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024); and 18 U.S.C. § 798. Under these three statutes, NSA is specifically authorized to protect certain information concerning its activities and its intelligence sources and methods from public disclosure.

**PLAINTIFFS' FOIA REQUESTS**

11.   On December 27, 2021, Plaintiffs submitted a request seeking "copies of all records in the possession or control of the NSA, including cross-references, regarding the issuance of the Beck Memo. Specifically, the Requesters are seeking the intelligence information

cited to in the Beck Memo and upon which NSA relied." The "Beck Memo" referred to by Plaintiffs refers to an Unclassified, but For Official Use Only (i.e. not for public dissemination outside of U.S. government channels) letter in support of an administrative proceeding in which a former NSA employee, John Beck, was a party. The letter also requested expedited processing.

12.  In response to Plaintiffs' December 27, 2021 request, NSA sent a letter on January 6, 2022, informing Plaintiffs that the request was assigned "Case Number 113420," and that NSA had begun to process the request. It further denied the request for expedited processing, as the request did not meet the criteria for expedited processing under the FOIA. On February 17, 2022, in an email to the Department of Justice attorney representing the Agency in this matter, Plaintiffs' counsel consented to narrowing the scope of the FOIA request to only "copies of the records referenced" in the 2014 Beck Memo. NSA conducted a search for responsive records, as detailed below. In an April 1, 2022 letter, NSA explained that two records, which totaled eight pages, were being withheld in their entirety under Exemptions 1 and 3 of the FOIA. First, the letter explained that because the information was currently and properly classified in accordance with E.O. 13526, it was exempt from disclosure based on Exemption 1. Second, the letter explained that the same information was also protected from release by statute, and thus also exempt from disclosure based upon Exemption 3. Specifically, the letter cited three statutes applicable to the case: 18 U.S.C. § 798, 50 U.S.C. § 3024(i), and Section 6 of Public Law 86-36 (codified at 50 U.S.C. § 3605).

### NSA'S SEARCH FOR RESPONSIVE DOCUMENTS

13.  As stated above, NSA conducted a search for responsive records. The Agency tasked the author of the "Beck Memo" to search for underlying intelligence referenced by the employee when they authored that document. That search produced three records.

14. After collecting those records, the Agency conducted a review of the materials to determine if they were, in fact, responsive to Plaintiff's request, as well as for segregability. Ultimately, the Agency determined that there were three records responsive to Plaintiffs' FOIA request. Plaintiffs later consented to limiting this request to only two documents, in a 23 March 2022 email with the Department of Justice attorney representing the Agency in this litigation, in order to exclude one record that only contained duplicative and largely nonresponsive content. On June 7, 2022, in an email with the Department of Justice attorney representing the agency, Plaintiffs' counsel agreed not to challenge the adequacy of the search.

15. The Agency also determined that the two remaining documents contained exempt material and were non-segregable. Therefore, NSA withheld those documents from Plaintiff in full for the reasons explained below.

## **MATERIALS WITHHELD IN FULL ARE PROTECTED FROM DISCLOSURE PURSUANT TO EXEMPTIONS 1 AND 3**

16. NSA withheld from disclosure two documents, totaling eight pages, pursuant to Exemptions 1 and 3. I have reviewed the material that was withheld in full and, as described in further detail below, determined that all of this material is classified and that no reasonably segregable portions can be released, and thus NSA is unable to produce any non-exempt portions of the responsive materials.

### FOIA Exemption 1

17. Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized—under criteria established by an Executive Order—to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order. The current Executive Order that establishes such criteria is E.O. 13526.

18. Section 1.1 of E.O. 13526 provides that information may be originally classified if four conditions are met: : (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the government; (3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

19. Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. The categories of classified information at issue here are found in Section 1.4(c), which includes intelligence activities (including covert action), intelligence sources and methods, or cryptology. The withheld information falls into this category.

20. In my role as a TOP SECRET OCA, I am authorized to make classification decisions at the TOP SECRET, SECRET, and CONFIDENTIAL levels. As set out below, I reviewed the withheld information pursuant to this FOIA request and determined that the withheld information is currently and properly classified TOP SECRET in accordance with E.O. 13526. Accordingly, the release of this information could reasonably be expected to cause exceptionally grave damage to the national security. The withheld materials are owned by and under the control of the United States. These documents each consist entirely of an intelligence product, which means that they contain information from intelligence reporting derived from SIGINT and associated analysis or explanation. These documents plainly cannot be released to the public without exceptionally grave damage to national security. The information from these

intelligence reports, which are closely held and protected products that NSA creates as part of its foreign intelligence mission, cannot be disclosed without risk to national security given the insights they provide or without revealing the classified sources and methods by which NSA collected the information. Since the information is currently and properly classified, it falls under Exemption 1.

21.     I have also determined that the classified material withheld in full does not contain meaningfully segregable information that could be released to the public. Even in those documents where there are stray lines containing unclassified or U//FOUO material, that material, without more, is not meaningful or substantive. Additionally, these documents concern specific topics the very existence of which are classified. While NSA is prepared to state, on the public record, that it has withheld a specified number of records responsive to Plaintiff's request, it cannot provide additional detail concerning the withheld material without risking exceptionally grave damage to national security. Lastly, in accordance with Section 1.7 of E.O. 13526, no information was classified or withheld in order to conceal violation of law, or to prevent embarrassment to the Agency.

FOIA Exemption 3

22.     While, for the aforementioned reasons, the materials withheld in full are currently and properly classified and accordingly exempt from disclosure pursuant to Exemption 1, all of the material withheld are concurrently exempt pursuant to Exemption 3, 5 U.S.C. § 552(b)(3).

23.     Section 552(b)(3) of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular

types of matters to be withheld. See 5 U.S.C. § 552(b)(3). Review of the application of this section of the FOIA consists solely of determining that the statute relied upon qualifies as an exempting statute under Exemption 3 and that the information withheld falls within the scope of the statute. No showing of any national security harm is required in order to maintain a proper exemption pursuant to Exemption 3.

24. The information withheld in full here is protected from disclosure by several statutes: Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605); Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024); and 18 U.S.C. § 798.[1] As stated above, Congress enacted these statutes to protect the fragile nature of NSA's SIGINT efforts, including, but not limited to, the existence and depth of signal intelligence-related analytical successes, weaknesses, and exploitation techniques. These statutes recognize the vulnerability of SIGINT to countermeasures and the significance of the potential loss of valuable intelligence information to national policymakers, combatant commanders, and the IC.

25. Section 6 is a statutory privilege unique to NSA and provides that "[n]othing in this chapter or any other law... shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency." By this language, Congress expressed its finding that disclosure of any information relating to NSA activities is potentially harmful. The protection provided by this statute is, by its very terms, absolute and NSA is not required to demonstrate specific harm to national security when

---

[1] Courts have held that all three statutes qualify as withholding statutes under Exemption 3. *See, e.g., Sims*, 471 U.S. at 167; *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012); *Larson*, 565 F.3d at 868–69.

10

invoking this statutory privilege, rather, NSA need only to show that the information falls within the scope of Section 6.[2] NSA's organization, functions, activities, and nonpublic personnel are therefore protected from disclosure regardless of whether or not the information is classified.

26. In addition to the applicable statutory framework of Section 6 of the National Security Act of 1959, the materials withheld in full also are protected from disclosure by 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of information: (i) concerning the communication intelligence activities of the United States, or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government. The term "communication intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and obtaining the information from such communications by other than the intended recipients." 18 U.S.C. § 798(b). As noted above, of withheld material implicates NSA's SIGINT information. This material, while classified, is also protected by the strictures of § 798. This criminal statute underscores Congress's commitment to protecting communication intelligence, which is central to NSA's mission, from disclosure.

27. Finally, Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. Intelligence Community, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. Whether the sources and

---

[2] *See e.g., Linder v. NSA*, 94 F.3d 693 (D.C. Cir. 1996) ("The protection afforded by section 6 is, by its very terms, absolute."); *see also, Hayden v. NSA*, 608 F.2d 1381, 1390 (D.C. Cir. 1979); *Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009); *Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001); *People for the American Way Found. v. NSA*, 462 F. Supp. 2d 21, 30 (D.D.C. 2006).

11

methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024.

28. Here, the details of the withheld material responsive to Plaintiffs' request concerns intelligence gathered by the Agency. Under all three Exemption 3 statutes laid out above, the information that was withheld is exempt for the following reasons.

29. Disclosure of this intelligence would reveal the Agency's specific intelligence collection activities, which is absolutely protected under Section 6 of the National Security Act of 1959 under the protections for information with respect to the Agency's activities.

30. Additionally, the withheld information constitutes communications intelligence because that intelligence was gathered by NSA's SIGINT efforts. Disclosing the withheld information would therefore violate 18 U.S.C. § 798's prohibition of such disclosure.

31. Finally, revealing the intelligence information would jeopardize the sources and methods NSA used to collect that information. As explained above, a disclosure that would create such a risk would violate NSA's requirement to guard against such a risk set forth by 50 U.S.C. § 3024.

32. Based upon my review, I therefore conclude that the documents withheld in full are exempt from disclosure because they are currently and properly classified TOP SECRET, but also, in light of the fact that their contents are protected from release by the aforementioned three statutory authorities: (1) Section 6, 50 U.S.C. § 3605, because the withheld information concerns the core function and/or activities of NSA; (2) 18 U.S.C. § 798, because disclosure would reveal communications intelligence; and (2) Section 102A(i)(1), 50 U.S.C. § 3024, because the information concerns intelligence sources and methods. For these reasons, the documents are withheld in full pursuant to Exemptions 1 and 3.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10TH day of June, 2022, pursuant to 28 U.S.C. § 1746.

LINDA M. KIYOSAKI
Chief of Enterprise Guidance Services
National Security Agency